| | |
|---|---|
| **TALAL S. HAMDAN, M.D.,** | ) |
| | ) |
|    **Plaintiff,** | ) |
| | ) |
|       **vs.** | )   **CAUSE NO. 1:13-cv-195-WTL-MJD** |
| | ) |
| **INDIANA UNIVERSITY HEALTH** | ) |
| **NORTH, LLC, f/k/a CLARION HEALTH** | ) |
| **NORTH, LLC, et al.,** | ) |
| | ) |
|    **Defendants.** | ) |

## ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendants' motion for summary judgment (dkt. no. 98) and the Plaintiff's motion for partial summary judgment (dkt. no. 100). The motions are fully briefed, and the Court, being duly advised, **GRANTS IN PART** the Defendants' motion and **DENIES** the Plaintiff's motion for the reasons, and to the extent, set forth below.

## I.   STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations,

that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

The fact that the parties have filed cross-motions for summary judgment does not alter the standard set forth in Federal Rule of Civil Procedure 56. When evaluating each side's motion, the Court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro Life. Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## II.   <u>BACKGROUND</u>

The Plaintiff, Dr. Talal S. Hamdan, is a cardiologist of Palestinian descent and a practicing Muslim. At all times relevant to this matter, Dr. Hamdan was employed by Heart Partners of Indiana, LLC ("Heart Partners"); however, he had medical staff privileges at twelve different hospitals, including Defendant Indiana University Health Hospital North, Inc. ("the Hospital"). On December 13, 2007, Dr. Hamdan signed a Medical Staff Statement of Applicant ("the Application") with the Hospital. By signing the Application, Dr. Hamdan agreed to be bound by the Hospital's Medical Staff Bylaws ("the Bylaws").

Beginning in 2009, Dr. Hamdan performed surgical procedures in the Hospital's Catherization Laboratory ("Cath Lab"); he was particularly interested in and skilled at limb salvage procedures. Shortly after he began working in the Cath Lab, Cath Lab employees began making discriminatory and derogatory comments about him.

- ·   Dr. Hamdan's nurse, Cindy Ross Barr, overheard Sharon Bridson, Linda Green, and JoEllen Simmons call Dr. Hamdan a "Middle Eastern chauvinistic pig" and "Muslim pig." They also said "we know how he treats women."

- Dr. Hamdan heard Brisdon say, "I've worked with these Middle Eastern Muslims before." She told Dr. Hamdan, "I've worked with your kind before."

- Simmons told Dr. Hamdan that "his kind mistreats" people, and that she "hated" him because he "thinks he can come here and just run things the way [he wants]."

- A medical device manufacturer overheard Kelly Beimer call Dr. Hamdan a "sand nigger."

- The same medical device manufacturer also overheard Caitlin Davis refer to Dr. Hamdan as a "foreigner," "second class citizen," and "not an American." Davis told Dr. Hamdan to "go back to where you came from."

- Connie Perry introduced her husband to Dr. Hamdan and then told the other Cath Lab employees that her "husband scared the shit out of Dr. Hamdan" and that he "hates Middle Easterners."

This type of discriminatory and derogatory remarks continued for the duration of Dr. Hamdan's time with the Hospital.

In addition to the above remarks, the Cath Lab employees began to file false and misleading complaints against Dr. Hamdan. The Hospital used a Web Based Incident/Complaint Reporting procedure that encouraged Hospital staff to report incidents with physicians' behavior or any clinical concerns. These reports were received by Dr. Lynda Smirz, Chief Medical Officer of the Hospital. The earliest reports are as follow:

- October 30-31, 2009, report completed by Rebekah Dennis. Rebekah alleged that Dr. Hamdan asked her if her husband regretted marrying her in front of Tim Alrichs, a medical device representative. Dennis felt this was a "personal attack" and was "inappropriate and rude." Dkt. No. 111-8. Both Dr. Hamdan and Alrichs deny this.

- October 30-31, 2009, report completed by Steve Allgood, Jessica Schult, and Chris Decker (Cath Lab employees). After a procedure was complete, Dr. Hamdan asked the patient how she was feeling. She reported "that she had feeling down there she had never had before." As Allgood was unhooking the patient from the EKG, Dr. Hamdan allegedly told him to "get his finger out of there." *Id.*

- November 18-19, 2009, report completed by Dennis. Dennis alleged that a patient, asked for pictures of her heart catheter so she could send them to her granddaughter who was in the medical field. Allegedly, Dr. Hamdan responded that he could give

the patient's granddaughter naked pictures of himself.  Sharon and Linda were witnesses.  Both Dr. Hamdan and the patient deny this.

- November 20-21, 2009, report completed by Green.  Green alleged that Dr. Hamdan initiated a conversation "of a sexual nature that was not appropriate for the workplace."  Dr. Hamdan and the medical device representatives present during the procedure deny this. *Id*.

On March 5, 2010, the Hospital received a complaint regarding Dr. Hamdan's treatment of a patient ("Patient F").  Davis completed a "Web Based Incident/Complaint Report Submission Detail" form after Dr. Hamdan performed a lower extremity atherectomy[1] in the Cath Lab; Brisdon was a witness.  Davis and Brisdon cited various concerns including, among others:  an unresolved vessel dissection; a high dosage of radiation; improper use of supplies (thirteen stents and twelve balloons); and improper sedation.  The report was referred to the Performance Assessment & Improvement Committee ("the PA&I Committee"), which was the Hospital's peer review committee responsible for identifying, evaluating, and making recommendations concerning patient care and appropriate utilization of hospital resources.

The PA&I Committee held a meeting on April 15, 2010.  Dr. Woodrow Corey, head of cardiology at the Hospital and a member of the PA&I Committee, reviewed the Patient F case and presented it to the rest of the PA&I Committee.  He noted that this type of case "is a judgment call as to how you approach it."  Dkt. No. 111-11.  He explained that during the procedure, Patient F was found to have disease below the knee, and that one stent was placed

---

[1] "An atherectomy is a procedure [performed under local anesthesia] that utilizes a catheter with a sharp blade on the end to remove plaque from a blood vessel.  The catheter is inserted into the artery through a small puncture in the artery[.]  The catheter is designed to collect the removed plaque in a chamber in the tip, which allows removal of the plaque as the device is removed from the artery.  The process can be repeated at the time the treatment is performed to remove a significant amount of disease from the artery, thus eliminating a blockage from atherosclerotic disease."
http://my.clevelandclinic.org/services/heart/services/vs_atherosclerosis_atherectomy (last visited November 5, 2014).

free floating. Dr. Corey further noted that there "are no specific guidelines for this procedure," but suggested that a vascular surgery consultation may have been appropriate. *Id*. The patient was noted to have gotten "good results." *Id*. Dr. Hamdan was also present at the meeting; he was given a chance to explain the incident, and the PA&I Committee members asked him questions. Dr. Hamdan assured the PA&I Committee that it was not his intent for the procedure to be so lengthy and to require so many resources. He also noted that he did consult a vascular surgeon, Dr. Gary Lemmon.

In determining the next steps, Dr. Smirz directed the PA&I Committee to the four incident reports filed by Cath Lab employees involving Dr. Hamdan. The PA&I Committee noted that corrective action was needed with regard to these four incidents. It also decided that further peer review of the Patient F case was needed.

Thus, Dr. Robert McCready and Dr. Himanshu Shah reviewed the Patient F case in May 2010. Dr. McCready, a vascular surgeon, opined that the patient should not "have undergone an endovascular attempt at limb salvage" and that it was "unfortunate that this case utilized so many precious resources." Dkt. No. 111-2. Similarly, Dr. Shah, an interventional radiologist, opined that the "care provided seem[ed] a bit over-aggressive both in terms of treatment as well as liberal utilization of expensive supplies." Dkt. No. 111-3.

As a result, on May 18, 2010, the PA&I Committee notified Dr. Hamdan via letter of the concerns it had with the Patient F case, specifically the number of stents and balloons he used and the long period of fluoroscopy exposure. The letter noted that the PA&I Committee "recommends that this particular case receive peer review" and "recommends that your future catheter cases be mentored by Dr. Ray Halum . . . on an ongoing basis until such time as Dr. Halum is able to confirm your clinical competence in those procedures." Dkt. No. 111-4.

Dr. Hamdan appealed the recommendations set forth in this letter; he was particularly concerned with the recommendation that Dr. Halum review all of his cases, as he was a competitor. Thus, on June 17, 2010, the PA&I Committee held a meeting to address his appeal. Dr. Hamdan was given the opportunity to present more information on the Patient F case, and the PA&I Committee asked him questions. Dr. Hamdan emphasized the complexity of his cases, noting that cases are referred to him for limb salvage.

On July 2, 2010, Dr. Hamdan received a letter from Dr. Claudia Somes, the Chair of the PA&I Committee. The letter notified Dr. Hamdan that he was being placed under a Focused Professional Practice Evaluation ("FPPE") for a six-month period of time—Dr. Hamdan's vascular procedures were to be evaluated by a focus group composed of various clinicians to evaluate the safety and efficacy of the cases and to ensure that Dr. Hamdan was complying with the applicable medical standards.

Meanwhile, Dr. Hamdan continued to experience discrimination by Hospital employees. Another incident report was filed on September 2, 2010, by a floor nurse. The nurse was unsure whether a patient should be discharged, and the patient's family was eagerly seeking answers. Dr. Hamdan had ordered the patient to be discharged, but had placed this order in the back of the patient's chart and did not check the "discharge" box on the cover sheet. When the nurse paged Dr. Hamdan asking if the patient could be discharged, he began yelling, screaming, and cursing, calling the nurse incompetent. The nurse reported this incident, alleging that Dr. Hamdan was "abrupt, rude, unprofessional, and confrontational" with her and that the patient's discharge was delayed because of the improper placement of the discharge order. Dkt. No. 111-8. Dr. Hamdan alleges that when he explained what happened to the nurse, she said "in this country, doctor, we

write from front to back." This was a reference to written Arabic, which is "backwards" as compared to the written English language.

Dr. Hamdan's FPPE was eventually completed by Dr. Harlamert; he reviewed approximately fifteen cases over the six-month period of time and "found nothing wrong." However, the Hospital received several incident reports of arterial perforations during Dr. Hamdan's procedures. Another complaint was filed on October 18, 2010, alleging that Dr. Hamdan initiated discussions with Cath Lab employees regarding their reporting of these perforations. It alleged that Dr. Hamdan warned the Cath Lab employees that when this happened at a hospital where he previously worked, there was a decrease in the number of working hours for the staff once he decided to no longer work at the hospital.

On November 26, 2010, Dr. Smirz sent a letter to Dr. Hamdan and enclosed three redacted incident reports. She noted that there was still "some difficulty with your comments, your body language, and your demeanor with staff[.]" Dkt. No. 111-4. The letter further noted that there was "a communication problem where information is not transmitted to the staff as team members. I feel if you are able to work on a more team approach with our nursing staff and our cath lab staff that these issues will resolve." *Id.* Dr. Hamdan responded by email on December 4, 2010. He noted that "team approach is important" and that he had "been trying [his] best to comply." He noted that certain complaints were "he say versus she say," but that he was hopeful to start the new year on a better note. *Id.*

Despite Dr. Harlamert's conclusion that there were no issues with Dr. Hamdan's procedures and that Dr. Hamdan was not a risk to the Hospital, some members of the PA&I Committee were still not satisfied. During the January 20, 2011, PA&I Committee meeting, concerns were expressed—Dr. Hamdan was a "cowboy," taking risky "fringe" cases, and

causing liability for the Hospital. Dkt. No. 111-15. The PA&I Committee decided that more information from Dr. Lemmon, the vascular surgeon, was needed. They also sought additional review from an outside source, Dr. Shah.

Meanwhile, the complaints continued. On January 22, 2011, Davis sent an email to Jon Goble, President of the Hospital, complaining of Dr. Hamdan's behavior. She noted that his behavior was "quite disturbing," that he spoke to staff in a "degrading manner," and that she believed she was in an "abusive relationship" with him professionally. Dkt. No. 112-5 at 634-37. In addition, she referenced a performance evaluation where she was noted to have been hostile to him; she noted that she "will not back down until this section of my performance review is removed from my file. His behavior is now affecting my reputation." *Id*. It was also reported that Dr. Hamdan referred to Davis as "jailbait" because of her young age.

At this point in time, Dr. Smirz was aware of the problems between the Cath Lab employees and Dr. Hamdan. She noted in emails that the Cath Lab employees "personally don't like Hamdan" and that their dislike had "overtones of cultural intolerance." Dkt. No. 112-5 at 625. Other Hospital management were skeptical of the "veracity" of the complaining Cath Lab employees, noting that they tended to "exaggerate" and that the truth was somewhere "in between." *Id*. at 640, 644, 647.

On January 28, 2011, an incident report was filed alleging that Dr. Hamdan was to discharge a patient so the patient could go to his dialysis appointment; however, Dr. Hamdan never did, and did not return phone calls or pages. On February 2, 2011, Cath Lab staff filed an incident report noting that Dr. Hamdan brought his children, ages three and four, to work and that they were disruptive. Thomas Catalano, a medical device representative, recalled that Dr. Hamdan was called to the Hospital to perform a critical limb salvage procedure during an ice

storm and was unable to find child care; however, he noted that Dr. Hamdan's children were not disruptive.

On February 23, 2011, another incident report was filed—Simmons filed a report regarding a dispute over a patient's sedation. Allegedly, Dr. Hamdan was performing a procedure, and the nurse was concerned with sedating the patient because of his respiratory condition. Dr. Hamdan requested a different nurse who would sedate the patient. Damita Williams, Chief Nursing Officer at the Hospital, however, emailed Dr. Smirz informing her that Simmons' report was inaccurate and should not go into Dr. Hamdan's file. She noted that the Cath Lab staff "cannot be *looking* for reasons to write him up. . . . I do not believe he had historically been innocent, but I will not participate in destroying his career either." Dkt. No. 112-5 at 647. Dr. Smirz agreed, noting that "with this group the truth is often somewhere in the middle." *Id.* Finally, On March 1, 2011, a complaint was filed that alleged that Dr. Hamdan was notified of a patient that was hospitalized because he was experiencing difficulties after a procedure; however, Dr. Hamdan did not see the patient until the following day, and care of the patient was assumed by two other doctors. Frustrated with the continuous reports that he believed were false and/or misleading, Dr. Hamdan allegedly ripped up the incident reports in front of Cath Lab staff saying, "This is what I think of your incident reports."

The PA&I Committee met on March 17, 2011, regarding Dr. Hamdan's FPPE. It reviewed a letter submitted by Dr. Lemmon on January 27, 2011; he reported that he was not consulted for any of Dr. Hamdan's procedures and that vascular surgery resources were never arranged for back-up in the event of an emergency during a procedure. He opined that Dr. Hamdan was performing unnecessary surgeries on "already dead legs." Dkt. No. 111-6; Dkt. No. 111-5. With regard to the peer review completed by Dr. Shah, he reported that in two of the five

cases he reviewed, he believed that Dr. Hamdan's approach was "too aggressive." Dkt. No. 111-7. Thus the PA&I Committee members continued to be wary of the riskiness of Dr. Hamdan's procedures. The "disruptive environment" of the Cath Lab was also discussed. Dkt. No. 111-16. The PA&I Committee scheduled a follow-up meeting with Dr. Hamdan regarding the results of the FPPE and his limb salvage program.

On March 21, 2011, Perry submitted two incident reports regarding Dr. Hamdan. The first alleged that Dr. Hamdan had insulted her abilities during a procedure by saying, "Do you know what your problem is? You have kids. Once you have kids, you forget everything and start thinking like a child." Dkt. No. 111-8. Dr. Hamdan and three medical device representatives deny this. Her second report involved an incident that occurred during the same procedure. Perry alleged that Dr. Hamdan threatened to stab her if she made another mistake mixing certain medications. At the time he said this, he allegedly had a hypodermic needle in his hand. Perry also reported this incident to Protective Services, security for the Hospital, because she feared for her personal safety. Dr. Hamdan and the three medical device representatives present during the procedure deny this; however, another nurse present during the procedure recalled hearing Dr. Hamdan say the word "stab" and saw him holding a dirty needle near Perry.

Dr. Smirz immediately referred this report to the PA&I Committee due to the severity of the allegation; a meeting was promptly scheduled for the following Monday. She informed Dr. Hamdan of the meeting via email noting that "[t]here was a complaint filed about a threatening remark made. And I am going to strongly advise you right now, DO NOT approach the nurses or techs in the cath lab about this. We will discuss at the meeting. Confronting these people will definitely make this worse." Dkt. No. 111-4. Despite Dr. Smirz's counsel, Dr. Hamdan reportedly went on "a tear through the cath lab. He is throwing things around the lab

complaining that because 'of you' I am being called to a meeting Monday and 'it is all your fault.'" Dkt. No. 112-5 at 659.  In an email to Dr. Smirz, Dr. Hamdan responded that

> [t]he remark I made was not intended to be threatening at all.  I had asked the nurse multiple times to not come into contact with radiation while I had it on.  That day she kept reaching in to do things while fluro was on.  The remark I made was all in fun and she as well as [I] LAUGHED ABOUT IT.  I also made sure to say I was joking with her as soon as I said it and that I would never do that.  I just wanted to make sure she is out of harms way from radiation.  She [acknowledged] me and laughed and said she knew I was playing.  S[h]e is a new nurse and I do not believe she understands the consequence of coming into the fluro while it is on.

Dkt. No. 111-4.

The PA&I Committee held a meeting to discuss this incident, among other things, on March 28, 2011.  Dr. Hamdan explained the incident, noting that in no way was he threatening Perry.  The minutes from the meeting are as follow:

> Dr. [Hamdan] does not feel in any way that he was threatening the nurse.  He does not feel that she understands the consequences of radiation.  He indicated that he asked her to stay away from the radiation and she said that she had had her babies.  He then noticed her hand on the screen and he told her that she needed to back off or she would possibly get burned or stabbed with a needle.  According to Dr. [Hamdan] she laughed and said that she sometimes forgets.

Dkt. No. 111-17.[2]  With regard to Dr. Lemmon, Dr. Hamdan expressed that he was unaware he needed to have back-up vascular surgery resources available for every case, and that he had moved some of the riskier patients to another facility.  The PA&I Committee concluded the meeting after discussing several options, including suspending Dr. Hamdan, placing a monitor in the Cath Lab, or moving him to another facility.

---

[2] There is much dispute over the actual facts of this incident, and what, if anything, Dr. Hamdan "admitted" to saying in his email to Dr. Smirz, at the PA&I Committee meeting, and during his deposition.  It is clear that Dr. Hamdan has a different view of the incident than the Hospital does; nevertheless, the Court finds both interpretations to be reasonable, and therefore declines to impose sanctions for the alleged "fabrication of evidence." Dkt. No. 116 at 17.

Around this same time, Dr. Smirz initiated a conversation with Dr. Richard Kovacs, a cardiologist affiliated with the Hospital and the Chairman of the Institutional Review Board ("IRB") at Indiana University. She informed Dr. Kovacs of Dr. Hamdan's ongoing peer review. Dr. Hamdan was an investigator on two IRB studies; however, after Dr. Kovacs was informed of the peer review, he suspended these trials. On April 7, 2011, Dr. Hamdan received an email notifying him that "as a result of the pending outcomes of a recent peer review, the IRB has ordered a suspension" on the two studies. Dkt. No. 112-6 at 889. The email was copied to several other individuals.

Ultimately, the PA&I Committee concluded that Dr. Hamdan was a "disruptive physician" and decided to make certain recommendations to the Medical Executive Committee ("the MEC"). On April 18, 2011, Dr. Hamdan received a "Notice of Medical Executive Committee Action" from the MEC. It noted that Dr. Hamdan "had a history of incidents of unprofessional conduct with nurses and other hospital staff, including demeaning or disrespectful comments, yelling, offensive jokes, and physical threats." Dkt. No. 104-4. The notice informed Dr. Hamdan that it voted to take the following actions: place a monitor in the Cath Lab to observe behaviors during his procedures; require Dr. Hamdan to participate in professional counseling to address proper interpersonal behavior in the work place; prohibit him from performing "Type D" procedures; and continue on FPPE. Dr. Hamdan appealed the decision and requested a hearing.

On June 16, 2011, the PA&I Committee held a meeting and voted to have all of Dr. Hamdan's cases reviewed prior to him performing any procedures. This recommendation was sent to the MEC. Thus, on July 18, 2011, the MEC sent a second "Notice of Medical Executive Committee Action" to Dr. Hamdan informing him that "all of your cases receive review and

approval by an interdisciplinary committee prior to performing cases. This prospective case review requirement has an indefinite duration and would be subject to modification by the MEC at any time." Again, Dr. Hamdan appealed this decision and requested a hearing.

In February 2012, the Designated Committee conducted an evidentiary hearing on appeal. It issued a Report and Recommendation on July 11, 2012, that provided, in relevant part, the following:

> [T]he Designated Committee unanimously finds that the evidence does not support the conclusion that monitoring, professional counseling, or continued FPPE are necessary. The committee is of the opinion that the testimony of the witnesses presented by Dr. Hamdan was more credible than the testimony of the witnesses presented by the Medical Staff regarding the allegations of unprofessional conduct. While the origin or cause of the apparent friction between some staff members and Dr. Hamdan is not completely clear from the evidence presented to the Designated Committee, that evidence does not establish that Dr. Hamdan was solely, or even primarily, at fault. There is evidence that at least some members of the cath lab staff, for whatever reason, had negative attitudes toward Dr. Hamdan and acted in an uncooperative, even defiant, manner toward him. This evidence tends to undercut the credibility of accusations about Dr. Hamdan's allegedly unprofessional conduct.
>
> . . .
>
> Having a monitor present in the cath lab to observe future procedures by Dr. Hamdan is not necessary or practical. . . . to the extent that requiring a monitor could be construed as an indication that it was Dr. Hamdan (and not the cath lab staff) who needed to be monitored, the Designated Committee is of the opinion that monitoring would not be appropriate, considering that the evidence presented to the committee was just as consistent with the conclusion that the behavior of some staff members was unprofessional and improper.
>
> . . .
>
> Continued professional counseling for Dr. Hamdan is not necessary. . . . Dr. Hamdan's psychological exam was within normal limits, and [] he showed no evidence of having a personality disorder, being a risk or danger in continuing to practice at the hospital, or needing medication in order to function well. . . . Dr. Hamdan was cooperative, forthcoming, and thoughtful during his examination.
>
> . . .

In light of the Designated Committee's conclusions based on the evidence presented to it, as described above, there is no need for Dr. Hamdan to continue participating in the FPPE.

. . .

There was no evidence that Dr. Hamdan experienced more complications or undesirable outcomes in his procedures than would be expected, given the types of patients he treated and the types of procedures he performed. In fact, although many of the patients Dr. Hamdan treated would be considered high-risk, and while some consider Dr. Hamdan's approach to be aggressive, there was no evidence presented to the Designated Committee that the cases reviewed by Dr. Shah had any untoward complications or undesirable results at all. The Designated Committee is of the opinion that requiring pre-screening of Dr. Hamdan's cases in the absence of evidence that Dr. Hamdan was performing inappropriate procedures, or evidence that Dr. Hamdan had an inappropriately high complication rate, would be an unreasonable and unjustified restriction on his practice.

Dkt. No. 112-2. On August 22, 2012, Dr. Hamdan was notified that the Board of Directors of the Hospital voted to affirm the Designated Committee's recommendation.

In October 2012, Dr. Hamdan resigned from Heart Partners and relinquished his privileges at the Hospital; he relocated to Florida. Dr. Hamdan filed suit against the Hospital on February 4, 2013. His amended complaint sets forth causes of action for race discrimination pursuant to 42 U.S.C. § 1981, intentional infliction of emotional distress, and defamation.

## III.    DISCUSSION

The Hospital moves for summary judgment on all claims against it; Dr. Hamdan moves for partial summary judgment—with respect to liability—on his § 1981 claim. Their arguments are addressed, in turn, below.

### A.  42 U.S.C. § 1981

Section 1981 of Title 42 of the United States Code provides that "all persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." Making and enforcing of contracts is defined as "the making, performance,

modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). With this in mind, the Court turns to the parties' arguments.

### 1. Contractual Relationship

The Hospital argues that it is entitled to summary judgment on Dr. Hamdan's § 1981 claim because there is no contractual relationship between them. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 480 (2006) (noting that liability under § 1981 is predicated on an existing or proposed contract). The Seventh Circuit has noted that

> § 1981's statutory language reveals no intent by Congress to give the word "contract" in § 1981 any specialized meaning; thus, we must assume that the ordinary meaning was intended. According to the Second Restatement of Contracts, a contract is "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."

*Walker v. Abbott Labs.*, 340 F.3d 471, 476 (7th Cir. 2003) (internal citations omitted).

The Hospital relies heavily on the fact that the Bylaws expressly state, "[t]hese Bylaws shall not be deemed as a contract of any kind. The conditions and duration of appointment to the Medical Staff or the granting of privileges shall not be deemed contractual in nature." Dkt. No. 102-2, Section 12.1. It also notes that during Dr. Hamdan's deposition, he "admitted that before he submitted his application to IU Health, he read and understood this language and also understood that IUHN did not intend to enter into a contract with him by way of the ByLaws." Dkt. No. 99 at 16. Dr. Hamdan, however, argues that there is a broader "contractual relationship" between him and the Hospital that is sufficient to maintain a claim under § 1981 despite what the Bylaws state. *See* dkt. no. 101 at 23, n. 3 (noting that Dr. Hamdan's "claim was not that *the Bylaws* constituted single contract, but that the entire *relationship* between himself and the Hospital was a 'contractual relationship' under the statute").

In support, he directs the Court to the 1991 Amendments to § 1981 that added the following language: "[f]or purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of *the contractual relationship*." 42 U.S.C. § 1981(b) (emphasis added). Subsection (b) was added to expressly overturn the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), which narrowly interpreted § 1981's "make and enforce" language to cover only conduct at the initial formation of the contract and conduct which impaired the right to enforce the contract via the legal system. The addition of subsection (b) broadened the scope of § 1981. The Seventh Circuit has recognized this:

> Congress's intention in [enacting] the Civil Rights Act of 1991 [was] to "restor[e] the broad scope of Section 1981 [to] ensure that all Americans may not be harassed, fired or otherwise discriminated against in contracts because of their race." H.R. Rep. No. 102–40 (II), at 2 (1991). Congress's intent to secure protection of all employees is further evident in its explicit disapproval of the way in which the Supreme Court in *Patterson* limited § 1981's application. *See* S. Rep. No. 101–315, at 14 (1990) (finding "a compelling need for legislation to overrule the *Patterson* decision and ensure that federal law prohibits all race discrimination in contracts").

*Walker*, 340 F.3d at 477.

Dr. Hamdan also points to the mutual benefits and obligations of the parties' contractual relationship. *See, e.g.*, *Terre Haute Reg'l Hosp., Inc. v. El-Issa*, 470 N.E.2d 1371, 1377 (Ind. Ct. App. 1984) ("However, as long as Dr. El-Issa was maintaining a surgical practice at Regional he was bound by the bylaws and current hospital policies. . . . the bylaws required Dr. El-Issa to participate in the operation of the Medical and Dental Staff by attending various hospital meetings, serving in representative capacities on committees and staff positions, to participate in various quality assurance programs, and to participate the emergency services on-call program at Regional. If Dr. El-Issa failed to meet these obligations, Regional could impose sanctions."). He

notes that in addition to the Bylaws, he "agreed to be bound by the Medical Staff Ongoing Professional Practice Evaluation Policy, the Disruptive Medical Staff Practitioner Policy, and the Peer Review Policy." Dkt. No. 101 at 7. The Hospital also had certain duties with regard to Dr. Hamdan—among other things, it had to investigate complaints lodged against him, perform annual reviews, and provide an opportunity for hearings if needed. *See id*. at 7-8. Dr. Hamdan also points to the $8 million the Hospital received in charges associated with procedures he performed.

The Court agrees with Dr. Hamdan that the trend since 1991 has been to *expand* § 1981 to cover certain relationships, rather than limiting its scope. *See, e.g.*, *Walker*, 340 F.3d at 477 (expanding "§ 1981's protections [to] the large portion of the employees in this country who work under at-will employment contracts."); *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799 (7th Cir. 1999) (allowing an independent contractor's § 1981 claim to go forward). In all, the Court believes there is enough of a contractual relationship between Dr. Hamdan and the Hospital to support a § 1981 claim. *See Wortham v. Am. Family Ins. Grp.*, 385 F.3d 1139, 1141 (8th Cir. 2004) ("'Section 1981 does not limit itself, or even refer, to employment contracts but embraces all contracts and therefore includes contracts by which a[n] . . . independent contractor . . . provides service to another.'") (quoting *Danco, Inc. v. Wal–Mart Stores, Inc*., 178 F.3d 8, 14 (1st Cir. 1999)). Accordingly, summary judgment will not be granted in favor of the Hospital on this basis.

## 2. Cat's Paw Theory

The Court now turns to whether Dr. Hamdan can prove the remainder of his prima facie case. He claims he can under what is known as the "cat's paw" theory of liability. *See Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012) ("This circuit and many others have also held or

assumed that a cat's paw theory will support holding the *employer* vicariously liable under . . . § 1981[.]").  "In the law of employment discrimination, the 'cat's paw' theory can apply when a biased subordinate who lacks decision-making power uses the formal decision-maker 'as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Matthews v. Waukesha Cnty.*, 759 F.3d 821, 829 (7th Cir. 2014) (quoting *Smith*, 681 F.3d at 897, n. 3).

> Under this theory, an employer is liable if a non-decision-maker who is motivated by discriminatory bias is a proximate cause of another employee's adverse employment action.  To prevail, [a plaintiff] must show that: (1) [the subordinates] actually harbored discriminatory animus against him; and (2) [the subordinates'] input was a proximate cause of [the plaintiff's adverse employment action].  Proximate cause requires only some direct relation between injury asserted and injurious conduct alleged, and excludes only those links that are too remote, purely contingent, or indirect.

*Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 604 (7th Cir. 2014) (internal citations and quotations marks omitted).

The Hospital first argues that Dr. Hamdan was not harmed by any discrimination.  It notes that Dr. Hamdan eventually prevailed on appeal, never had his privileges revoked or suspended, and held hospital privileges at eleven other hospitals where he could perform his procedures. *See* dkt. no. 99 at 23; dkt. no. 109 at 20.  Further, it argues that Dr. Hamdan voluntarily resigned his employment with Heart Partners and voluntarily relinquished his Hospital privileges. *See id.*

The Court agrees with Dr. Hamdan, however, that the Hospital takes a narrow view of "harm to Dr. Hamdan's contractual relationship."  It is true that Dr. Hamdan did not suffer a typical "adverse employment action" in that he was not fired or demoted; however, he argues that he "was discriminated against, on the basis of his race and ethnicity, in his ability to enjoy all of the benefits of his contractual relationship with the Hospital on two distinct occasions—on April 14, 2011, when the first (behavioral) Adverse Action letter was issued by the MEC, and

three months later, on July 18, 2011, when the second (clinical) Adverse Action letter followed."

Dkt. No. 116 at 2. In other words, it was the issuance of these two letters that precluded him from enjoying "all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C.A. § 1981(b). Dr. Hamdan further explains:

> Assuredly, the benefits of the contractual relationship that Dr. Hamdan had with the Hospital included not having to spend hundreds of thousands of dollars defending against racially motivated bogus charges, and not having reports of racially motivated bogus charges spread throughout the medical services industry.
>
> Put another way, physicians at the Hospital who were not the subject of a campaign of racial harassment and hostility were able to enjoy the "benefit" of simply going about their business and practicing medicine. Dr. Hamdan was denied this benefit, and § 1981 is exactly the right remedy to address the harm that he suffered.

Dkt. No. 113 at 20-21. The Court agrees that § 1981 is broad enough to encompass this type of harm. *See, e.g.*, *Garrett v. Tandy Corp.*, 295 F.3d 94, 100 (1st Cir. 2002) ("The 1991 expansion of the definition of 'make and enforce contracts' in section 1981, then, extends the reach of the statute to situations beyond the four corners of a particular contract; the extension applies to those situations in which a merchant, acting out of racial animus, impedes a customer's ability to . . . enjoy the benefits of [] a contractual relationship."). Of course, what damages he may be allowed to recover for this alleged harm is an issue for trial.[3]

The Court now turns to the applicability of the cat's paw theory to this case. The first prong is easily satisfied. The Court concurs with Dr. Hamdan that the "litany of racial and ethnic

---

[3] However, in light of Dr. Hamdan's resignation from Heart Partners and voluntary relinquishment of his privileges with the Hospital, he cannot recover damages from the Hospital for "thousands of dollars in moving expenses to relocate to Florida; the cost of a home in Florida while his Indiana home remained unsold; [or] the expense to locate new employment." Dkt. No. 101 at 20. Dr. Hamdan admitted in his deposition that he "asked for a resignation" from Heart Partners, that it "was purely [his] choice" to do so, and that he relinquished his hospital privileges because he had decided to pursue a job in Tampa, Florida. Dkt. No. 99-2 at 40, 43, 45, 54.

harassment" Dr. Hamdan was subjected to by the Cath Lab employees easily proves that they "actually harbored discriminatory animus towards him."[4]  The real question arises under the second prong.

As an initial matter, the Hospital's argues that "[p]recedent in this Circuit requires that before IUHN can be found to be a cat's paw, there must be *blind reliance* on the cath lab employees' statements as the basis for its decision to initiate peer review." Dkt. No. 109 at 11. This statement comes from *Staub v. Proctor Hosp.*, 560 F.3d 647 (7th Cir. 2009), a Seventh Circuit case that, as Dr. Hamdan correctly notes, was reversed by the Supreme Court on appeal. *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186 (2011).[5]  The facts of the case are as follow.  Mr. Staub worked as an angiography technician for Proctor Hospital; he was also a member of the United States Army Reserve, which required him to be absent from work one weekend a month as well as two to three weeks per year to complete the requisite training.  Unfortunately, his supervisors were hostile to Mr. Staub's military obligations and issued him falsified and unjustified "corrective actions" that eventually led to his termination.  Mr. Staub sued under the

---

[4] The Hospital takes issue with some of the evidence Dr. Hamdan submitted in support of his partial motion for summary judgment.  It first argues that the affidavit of Dr. Hamdan's nurse, Cindy Ross Barr (dkt. no. 112-5 at 707-09) is too vague to be considered because it does not "connect dates to her complaints." Dkt. No. 109 at 14, n. 6.  This argument is without merit. The affidavit notes that from 2009 through 2010 Barr worked in the Cath Lab at least two days a week and heard racial questions, statements, and comments made to or about Dr. Hamdan. Inasmuch as the adverse employment actions are alleged to have happened in 2011, it is clear that the affidavit establishes that the racial questions, statements, and comments were made beforehand—from 2009-2010.  This is sufficient.

Similarly, it argues that the affidavit of Joseph Kafi, a medical device manufacturer, was not signed and contained inadmissible hearsay.  The signature has since been remedied, *see* dkt. no. 112-6 at 757; moreover, statements such as "I heard Kelly openly refer to Dr. Hamdan as a 'sand nigger'" are not hearsay.

[5] The Hospital failed to note the subsequent history of *Staub* when it first cited it. Dkt. No. 109 at 11.  While this omission is regrettable, the Court disagrees with Dr. Hamdan that it is sanctionable.

Uniformed Services Employment and Reemployment Rights Act ("USERRA") under the cat's paw theory of liability, claiming that his termination was motivated by his supervisors' hostility towards his obligations as a military reservist.

The Seventh Circuit, relying on its own precedent, reversed the jury's verdict in favor of Mr. Staub. It noted that the ultimate decisionmaker did not blindly rely on the supervisors' information, but rather "exercise[d] her independent judgment." *Staub*, 560 F.3d at 659. Accordingly, it held that no "reasonable jury could have concluded that Staub was fired because he was a member of the military." *Id.* On appeal, however, the Supreme Court reversed and announced the following:

> [I]t is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm. Proximate cause requires only some direct relation between the injury asserted and the injurious conduct alleged, and excludes only those link[s] that are too remote, purely contingent, or indirect. We do not think that the ultimate decisionmaker's exercise of judgment automatically renders the link to the supervisor's bias "remote" or "purely contingent." The decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes. Nor can the ultimate decisionmaker's judgment be deemed a superseding cause of the harm. A cause can be thought "superseding" only if it is a cause of independent origin that was not foreseeable.
>
> …
>
> We are aware of no principle in tort or agency law under which an employer's mere conduct of an independent investigation has a claim-preclusive effect. Nor do we think the independent investigation somehow relieves the employer of "fault." The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision.
>
> …
>
> We therefore hold that if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA.

*Staub*, 131 S. Ct. at 1192-94 (2011) (internal citations and quotation marks omitted).

The Hospital correctly points out that in a footnote, however, that the Supreme Court noted that it expressed "no view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision. *Id*. at 1194, n. 4. Therefore, it argues that "*Straub* [sic] did not impact the standard in the 7th Circuit with respect to cat's paw liability in cases, like this one, where the alleged discrimination came from an employee directly to a decisionmaker." Dkt. No. 118 at 5, n. 3. A case the Hospital cites in support of this position, however, actually illustrates the precise opposite.

In *Johnson v. Koppers, Inc.*, 726 F.3d 910, 915 (7th Cir. 2013), Ms. Johnson alleged that she was terminated from Koppers because of her race and gender; specifically, she claimed that "her *co-worker*, O'Connell, harbored discriminatory animus against her race and gender" and made false reports "to induce the plant manager to terminate Johnson's employment at Koppers." *Id*. at 914 (emphasis added). In discussing the standard for the cat's paw theory of liability, the Seventh Circuit said that "Johnson needs to show that O'Connell, motivated by discriminatory animus, concocted a false story about Johnson, *and that O'Connell's story was the proximate cause of Johnson's termination*." *Id*. at 915. The Seventh Circuit ultimately concluded that Johnson did not have any evidence of O'Connell's discriminatory animus and that she was fired because of a physical altercation between her and O'Connell that was witnessed by an independent third party. *Id*. However, it is clear from this case that the distinction the Hospital desires to draw—between supervisors and co-workers—finds no support in the Seventh Circuit.[6]

_____

[6] The Hospital cites to three unpublished district court cases that it claims supports its position. Of course, these opinions are not binding on this Court. Further, the Court finds them to be unpersuasive. *Myers v. TU United Trailers of United Expressline*, 2012 U.S. Dist. LEXIS

*See also Nichols*, 755 F.3d at 604 (noting that the plaintiff needed to show that his co-worker "harbored discriminatory animus against him" and that the co-worker's "input was a proximate cause" of the plaintiff's termination in order to support his cat's paw theory of liability).[7]

This is not to say that an "independent investigation" will *never* break the chain of causation in cat's paw theory cases; rather, it simply means that it will not *automatically* preclude liability. As the Supreme Court noted, an "injury" can have multiple proximate causes. With this in mind, the Court turns to whether the Cath Lab's input was the proximate cause of the "Notice of Medical Executive Committee Action" letters.

Dr. Hamdan argues that the Cath Lab employees' false and/or misleading complaints played an "integral" role in the MEC's decision to issue two "Notice of Medical Executive Committee Action" letters—he argues that they were "front and center" to that decision. Dkt. No. 116 at 17. He argues that the MEC failed to investigate fully whether the complaints were true; rather, it simply "took action." *See id*. at 9 ("[T]he MEC took final action against Dr. Hamdan without clear proof of the truthfulness of the complaints[.]"). The Hospital's argument in response to this is less than clear—many of the pages dedicated to why it is entitled to summary judgment focus on arguments that are wholly irrelevant to Dr. Hamdan's claim brought pursuant to the cat's paw theory of liability for the MEC's decision to issue the two letters. Finally, however, in its Reply brief, it argues that Dr. Hamdan "provides absolutely no evidence causally linking the cath lab employees' conduct to IUHN's investigation. Dr. Hamdan simply

_____

8768 (N.D. Ind. Jan. 19, 2012), cites to the Seventh Circuit's decision in *Staub* with no mention of the subsequent Supreme Court case. Similarly, *Smith v. Donahoe*, 2014 U.S. Dist. LEXIS 72877 (N.D. Ill. May 29, 2014) relies on pre-*Staub* cases, i.e., *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 383 (7th Cir. 2011), again, with no mention of the Supreme Court's *Staub* decision. Finally, *Anderson v. Bd. of Educ. of Caholia Sch. Dist. No. 187*, 2012 U.S. Dist. LEXIS 18194 (S.D. Ill. Feb. 14, 2012), cites to several pre-*Staub* cases in a footnote.

[7] The Court notes that *Nichols* was decided after the Hospital's briefing was complete.

cannot close the evidentiary loop demonstrating that IUHN's investigation—or alleged lack thereof—was motivated by racial animus." Dkt. No. 118 at 4.

The Hospital fails to appreciate the cat's paw theory in making this argument. Dr. Hamdan's argument is that the Hospital was "duped" by the Cath Lab employees; in other words, it was the *Cath Lab employees* who were motivated by racial animus. They then "duped" the Hospital by filing allegedly false and/or misleading complaints that persuaded the Hospital to issue the two "Notice of Medical Executive Committee Action" letters, allegedly, without confirming their truthfulness. In fact, the April 18, 2011, "Notice of Medical Executive Committee Action" letter cites several complaints that Dr. Hamdan alleges were false and/or misleading. *See* dkt. no. 111-4 ("Asking a nurse if her husband regretted marrying her"; "Using . . . foul language with staff for a discharge delay"; "Belittling a nurse's effort to perform a task by saying . . . when you have children you start thinking like a four-year-old"; the "stabbing" incident). Viewing the facts in the light most favorable to Dr. Hamdan, the Court believes that a reasonable jury could find this theory to be supported; accordingly, the Hospital's motion for summary judgment on Dr. Hamdan's § 1981 claim is **DENIED**.[8] Viewing the facts in the light most favorable to the Hospital, however, the Court finds that a reasonable jury could also conclude that the Cath Lab employees' racially-motivated input was not the proximate cause of the two letters. Accordingly, Dr. Hamdan's partial motion for summary judgment as to liability on his § 1981 claim is also **DENIED**.

---

[8] Accordingly, for purposes of summary judgment, the Court need not address Dr. Hamdan's so-called "converse collateral estoppel" theory. *See* dkt. no. 113 at 5-8. However, it does note that whether or not Dr. Hamdan's contractual relationship with the Hospital was impaired because of his race was certainly not a question before the Designated Committee. As Dr. Hamdan himself notes, "there is always a possibility that Dr. Hamdan's current counsel . . . will not convince a jury of the same facts as found by the Committee." *Id*. at 8.

## B. Defamation

The Hospital also moves for summary judgment on Dr. Hamdan's defamation claim. "To establish a claim of defamation, a plaintiff must prove the existence of a communication with defamatory imputation, malice, publication, and damages." *Dugan v. Mittal Steel USA Inc.*, 929 N.E.2d 184, 186 (Ind. 2010) (internal quotation marks omitted). Dr. Hamdan has alleged that he was defamed by the Cath Lab employees' false complaints[9] and the re-publication of defamatory statements to Dr. Kovacs.[10]

The Hospital argues that it is entitled to immunity under federal and Indiana law because the complaints provided information to a professional review committee. The Health Care Quality Improvement Act ("HCQIA") provides immunity from suit for providing information to a professional review body "unless such information is false and the person providing it knew that such information was false." 42 U.S.C. § 11111(a)(2).[11] In addition to the immunity provided under federal law, Indiana state law provides immunity to individuals involved in peer review proceedings:

> There is no liability on the part of, and no action of any nature shall arise against, the personnel of a peer review committee for any act, statement made in the confines of the committee, or proceeding of the committee made in good faith in

---

[9] Dr. Hamdan argues that "the Hospital is liable for the defamatory statements of its employees under the doctrine of respondent superior." Dkt. No. 113 at 26.

[10] The Hospital also notes that Dr. Hamdan claims he was defamed when Dr. Smirz filled out a credentialing form from Tampa Memorial. While Dr. Hamdan included this in his fact section, it does not appear to the Court that any defamation claim is premised on this occurrence.

[11] The Hospital claims it meets the four elements in order for immunity to attach: that it initiated per review "(1) in the reasonable belief that the action was in the furtherance of quality health care; (2) after a reasonable effort to obtain the facts of the matter; (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts[.]" 42 U.S.C. § 11112(a). Dr. Hamdan seemingly takes issue with elements two and four; the Court expresses no opinion as to whether the Hospital meets all four requirements.

regard to evaluation of patient care as that term is defined and limited in IC 34-6-2-44.

Ind. Code § 34-30-15-15.

> The governing board and the governing board's employees, agents, consultants, and attorneys have absolute immunity from civil liability for communications, discussions, actions taken, and reports made concerning disciplinary action or investigation taken or contemplated if the reports or actions are made in good faith and without malice.

Ind. Code § 16-21-2-6(b).

Dr. Hamdan argues that "[a]t a minimum there is a genuine factual dispute about the truthfulness of the information provided and the state of mind of the person providing the information." Dkt. No. 113 at 27. The Hospital disagrees, relying on *Bals v. Verduzco*, 600 N.E.2d 1353 (Ind. 1992). In *Bals*, the Indiana Supreme Court held the following:

> By simply denying the factual content of [the defendant's] reports, or by referring to other evidence disputing such content, [the plaintiff] does not present substantial evidence that [the defendant] had no grounds for belief in the truth of the statements in his reports.

*Bals*, 600 N.E.2d at 1357. Years later, the Supreme Court upheld this portion of *Bals*, explaining it as follows: "In other words, although others may have disagreed and reached a different conclusion, '[t]he election to make one of two reasonable interpretations does not demonstrate' a knowing disregard for the truth." *Williams v. Tharp*, 914 N.E.2d 756, 767 (Ind. 2009) (quoting *Burns v. Rice*, 813 N.E.2d 25, 36 (Ohio 2004)). Thus, the Hospital argues that "Dr. Hamdan failed to present any evidence demonstrating the cath lab complaints were not made in good faith[.]" Dkt. No. 118 at 15.

The Court disagrees. Not only has Dr. Hamdan denied the facts alleged in the Cath Lab employees' complaints and presented evidence that disputes the facts as alleged in the complaints, he has presented evidence that the Cath Lab employees—who made the complaints—harbored racial animus toward him. He has presented evidence that beginning in

2009—before the complaints began—he was called a "Muslim pig" and a "sand nigger." Moreover, the Hospital was aware of the "cultural intolerance" of the Cath Lab employees, and questioned the veracity of the complaints. The Court believes Dr. Hamdan has created a genuine issue of fact as to whether the complaints were made in good faith. *See Williams*, 914 N.E.2d at 662-66 (noting that "unless only one conclusion can be drawn from the evidence, the question of whether the privilege has been abused is for the jury" and "that a defendant's state of mind is ordinarily a question for the jury"). Accordingly, summary judgment is **DENIED** on the defamation claim based on the Cath Lab employees' complaints.

With regard to the defamation claim for the re-publication involving Dr. Kovacs, however, the Court agrees with the Hospital. Dr. Kovacs was informed by Dr. Smirz of the fact that Dr. Hamdan was undergoing peer review, that it had to do with endovascular procedures he performed in the Cath Lab, and that it had a connection to his IRB research. *See* dkt. no. 99-9 at 14-15. There is no evidence, however, that Dr. Kovacs was informed of the particular allegedly-defamatory statements contained in the Cath Lab employees' complaints. In other words, Dr. Kovacs was informed, truthfully, that Dr. Hamdan was being peer reviewed. *See Melton v. Ousley*, 925 N.E.2d 430, 437 (Ind. Ct. App. 2010) ("[T]ruth is a complete defense in civil actions for defamation."). Accordingly, summary judgment is **GRANTED** in favor of the Hospital on Dr. Hamdan's defamation claim regarding the re-publication to Dr. Kovacs.

### C. Intentional Infliction of Emotional Distress

The Hospital also moves for summary judgment on Dr. Hamdan's intentional infliction of emotional distress ("IIED") claim. Its argument is contained in the following footnote:

> It is not clear whether Dr. Hamdan is bringing a separate claim for intentional infliction of emotional distress. To the extent his Amended Complaint could be read to allege such a claim, this claim also fails as a matter of law for the same reasons his Section 1981 claim fails. In order to prove intentional infliction of emotional

27

distress, Dr. Hamdan must show that IUHN, by "extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another...." *Ledbetter v. Ross*, 725 N.E.2d 120, 123-24 (Ind. Ct. App. 2000) (quoting *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991)); *Branham v. Celadon Trucking Services* 744 N.E.2d 514 at 522-523 (Ind. Ct. App. 2001); *Pohle v. Cheatham*, 724 N.E.2d 655, 659 (Ind. Ct. App. 2000). The same evidence that demonstrates the hospital acted reasonably when confronted with complaints against Dr. Hamdan demonstrates that the hospital did not act outrageously or recklessly. Further, the hospital's conduct is protected under the blanket of immunity. *See infra*. Even if the conduct were outrageous or reckless it is protected activity as part of the peer review process, to which Dr. Hamdan agreed to be subject.

Dkt. No. 99 at 24, n. 16.[12]  Because summary judgment is denied as to Dr. Hamdan's other claims—and because the Hospital makes no other argument as to why it is entitled to summary judgment on this claim—summary judgment is also **DENIED** as to his IIED claim.

## IV.    CONCLUSION

For the foregoing reasons, the Hospital's motion for summary judgment (dkt. no. 98) is **GRANTED IN PART** as to Dr. Hamdan's defamation claim for re-publication to Dr. Kovacs.

Dr. Hamdan's motion for partial summary judgment (dkt. no. 100) is **DENIED**.

SO ORDERED: 11/05/14

*William T Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification

---

[12] Dr. Hamdan's Amended Complaint reads as follows:  "As a result of the actions of the Defendants as described above, including inaction, the Hospital intentionally or recklessly inflicted severe emotional harm upon Dr. Talal Hamdan." Dkt. No. 14, ¶ 49.