UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TALAL S. HAMDAN, M.D., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CAUSE NO. 1:13-cv-195-WTL-MJD |
| ) | |
| INDIANA UNIVERSITY HEALTH ) | |
| NORTH, LLC, f/k/a CLARION HEALTH ) | |
| NORTH, LLC, et al., ) | |
| ) | |
| Defendants. ) | |

## ENTRY ON VARIOUS MOTIONS

Before the Court are three motions: the Plaintiff's Motion to Exclude the Opinions and Testimony of Defendants' Proffered Expert, Gary Skoog, PhD (Dkt. No. 140); the Defendants' Motion to Exclude and Objection to Plaintiff's Proffered Experts (Dkt. No. 142); and the Defendants' Motion for Clarification (Dkt. No. 154). The motions are fully briefed and the Court, being duly advised, rules as follows.

### I.  Defendants' Motion to Exclude and Objection to Plaintiff's Proffered Experts

The Defendants (collectively, "the Hospital") move to exclude the opinions offered by all four of Plaintiff Dr. Talal Hamdan's experts. Dr. Hamdan offered the opinions of Dr. Marc R. Stauffer, Dr. Craig M. Walker, and Dr. Barry S. Weinstock, all of whom, like him, are interventional cardiologists. George V. Launey, PhD, relying on the opinions of these three interventional cardiologists, then calculated Dr. Hamdan's past and future economic loss as a result of the facts underlying this lawsuit.

The Seventh Circuit has recently reaffirmed the standard that district courts must use to determine if expert testimony is admissible at trial:

> Expert testimony is admissible at trial if the testimony is relevant to a fact in issue, is based on sufficient facts or data, and is the product of reliable scientific or other expert methods that are properly applied. Fed. R. Evid. 702. The Supreme Court in *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)] interpreted Rule 702 to require that district courts, prior to admitting expert testimony, determine whether the testimony is reliable and whether it will assist the trier of fact in determining some fact that is at issue. That is, the district court serves as a "gatekeeper" whose role is to ensure that an expert's testimony is reliable and relevant.

*Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014) (internal citations omitted). With this standard in mind, the Court turns to the Hospital's objections, beginning with the Hospital's objections to the three interventional cardiologists' opinions.

### A. Dr. Stauffer

The pertinent portion of Dr. Stauffer's opinion is as follows:

> In early 2013, Talal S. Hamdan, M.D. (Dr. Hamdan) was employed by me through Palma Ceia Heart and Vascular until the present. Dr. Hamdan was able to earn Six Hundred Thousand Dollars ($600,000.00) in 2013 based upon a hospital-supported contract. Dr. Hamdan will earn approximately Three to Four Hundred Thousand Dollars ($300,000.00 - $400,000.00) between 2014 and 2016. Thereafter, Dr. Hamdan's maximum earning ability in this practice will be Five to Six Hundred Thousand Dollars ($500,000.00 - $600,000.00).

Dkt. No. 142-3 ¶ 8. The Hospital argues that Dr. Stauffer's opinions are not "expert" opinions. It notes that he simply offers "factual data that any lay witness employer could offer with respect to any employee." Dkt. No. 142 at 7. With regard to Dr. Stauffer's expert opinion that $600,000 is Dr. Hamdan's maximum earning ability, the Court agrees with Dr. Hamdan that this is an appropriate expert opinion. *See* Dkt. No. 146 at 12-13 ("*That* opinion requires the kind of special knowledge that experts have and that jurors have never encountered before. It depends upon knowledge of the earning ability of interventional cardiologists in the area generally, and upon

the reimbursement rates for various procedures. It depends upon experience in hiring physicians in various specialties . . ."). This is an appropriate expert opinion.[1]

Dr. Hamdan further notes that "[t]he point of Dr. Stauffer's submission was to allow Dr. Launey to determine Dr. Hamdan's 'residual earning capacity,' as an *offset* to the loss of his earning capacity in the national market." *Id*. at 11. In other words, the point of Dr. Stauffer's opinion is to provide the amount of money that must be offset from Dr. Hamdan's economic loss amount in order to account for his mitigation of damages, i.e., the fact that he found new employment. The Hospital argues that this opinion is not needed in light of Dr. Hamdan's "voluntary resignation" from Heart Partners. A bit of background it needed with regard to this "voluntary resignation" claim before the Court can properly resolve the Hospital's motion.

In 2014, the Hospital moved for summary judgment on Dr. Hamdan's 42 U.S.C. § 1981 claim, arguing, in part, that he was not harmed by any alleged discrimination. *See* Dkt. No. 99 at 23 ("Dr. Hamdan did not suffer any impairment or loss to his alleged contractual interest as a result of any alleged discrimination."). It also argued that Dr. Hamdan could not recover damages as a result of his *voluntary* resignation from Heart Partners. *See id*. ("It is further undisputed that Dr. Hamdan . . . voluntarily resigned his employment with Heart Partners and relinquished his privileges at IUHN."); *id*. at 13, n. 4 (noting that "Dr. Hamdan voluntarily resigned from Heart Partners and relinquished his privileges at all Indiana hospitals, including IUHN in October 2012" and "Dr. Hamdan was not asked to resign from Heart Partners, but did so voluntarily purely of his own choice"). Dr. Hamdan disagreed and argued that he did suffer damages as a result of his alleged discrimination:

---

[1] Dr. Stauffer may testify, as Dr. Hamdan's employer, regarding the salary Dr. Hamdan has earned in the past.

3

> As a result of the racially motivated complaints, the Defendants' failure to properly protect him from racial harassment, the filing of two adverse actions, the peer review proceedings and defamation, Dr. Hamdan incurred and paid in excess of $300,000.00 in attorneys' fees [to defend the peer review]; thousands of dollars in moving expenses to relocate to Florida; the cost of a home in Florida while his Indiana home remained unsold; the expense to locate new employment, loss of revenue from device manufacturers (for teaching, lecturing, consulting, serving as an investigator) and hundreds of thousands of dollars in lost wages, plus significant financial losses of income in the future as well as emotional pain and suffering.

Dkt. No. 101 at 20-21. He also noted that "[o]nce the legal harm to Dr. Hamdan is shown in this fashion, the measure of the damages he suffered is a separate matter. The plaintiff will bear the burden of showing that denial to him of the benefits of the contractual relationship *caused* specific monetary and other damage." Dkt. No. 113 at 21, n. 3.

On November 5, 2014, the Court ruled on the parties' cross-motions for summary judgment. The Court denied the Hospital's motion for summary judgment with regard to Dr. Hamdan's § 1981 claim, noting that § 1981 was broad enough to encompass the type of harm Dr. Hamdan alleged, but that "what damages he may be allowed to recover for this alleged harm is an issue for trial." Dkt. No. 147 at 19. Then, the Court noted the following in a footnote:

> However, in light of Dr. Hamdan's resignation from Heart Partners and voluntary relinquishment of his privileges with the Hospital, he cannot recover damages from the Hospital for "thousands of dollars in moving expenses to relocate to Florida; the cost of a home in Florida while his Indiana home remained unsold; [or] the expense to locate new employment." Dkt. No. 101 at 20. Dr. Hamdan admitted in his deposition that he "asked for a resignation" from Heart Partners, that it "was purely [his] choice" to do so, and that he relinquished his hospital privileges because he had decided to pursue a job in Tampa, Florida. Dkt. No. 99-2 at 40, 43, 45, 54.

*Id*. at 19, n. 3.

Turning now to the motion at bar, in Dr. Hamdan's Response—filed *before* the Court ruled on the parties' cross-motions for summary judgment—he argues that he did not voluntarily leave Heart Partners, but rather, was "effectively forced out of Heart Partners, even as his

4

privileges to practice at the Hospital . . . were being constructively revoked." Dkt. No. 146 at 4-5; *see also id*. at 8 (noting that his employment with Heart Partners ended due to "a termination or a constructive termination, not a 'voluntary choice to resign.'"). He has submitted a supplemental affidavit, Dkt. No. 146-4 at 87-93, in support of this claim that paints a different picture than a "voluntary resignation" with regard to his employment with Heart Partners.[2] Essentially, Dr. Hamdan's argument is that Heart Partners was being non-committal during his contract negotiations and he "became concerned that he was being pushed out of the group, and that his contract would not be renewed." Dkt. No. 146 at 6. Thus, he tendered a letter of resignation to Heart Partners, citing several breaches of his employment contract.

In its Reply—filed *after* the Court's Entry on summary judgment, the Hospital seizes on the Court's footnote and argues as follows:

> [t]he Court agrees that Hamdan's voluntarily resignation from his employment in Indiana in order to take a position in Tampa, Florida would effectively "cut-off" his post-resignation damages. . . . As a result, Hamdan's proffered expert testimony by Dr. Stauffer and Dr. Weinstock pertaining to Hamdan's alleged damage to his clinical practice ***after*** his voluntary resignation in October 2012 is irrelevant and should be excluded.

Dkt. No. 152 at 3. To begin, the Hospital is incorrect in stating that "[t]he Court agrees that Hamdan's voluntarily resignation from his employment in Indiana in order to take a position in Tampa, Florida would effectively *'cut-off' his post-resignation damages*." *Id*. (emphasis added). The Court's Entry simply noted that because it appeared that Dr. Hamdan voluntarily moved to Florida, he cannot recover *relocation expenses* as part of his damages. It said nothing about a complete bar to his post-resignation damages. Indeed, Dr. Hamdan is entitled to argue that he

---

[2] Dr. Hamdan notes that he did not challenge the Hospital's argument that he voluntarily resigned from Heart Partners because his motion for partial summary judgment was limited to liability only. *See* Dkt. No. 146 at 6, n. 5.

5

has suffered reputational damages—which resulted in the loss of future income—despite his move to Florida.

That said, the issue of "offset" remains; some amount of money—to account for Dr. Hamdan's employment—should be offset from his potential damages. This could either be the amount he will earn in Florida (if he was "constructively terminated") or the amount he could have earned had he remained employed in Indiana (if he "voluntarily resigned"). The Court believes that whether Dr. Hamdan was "effectively forced out" of Heart Partners is an issue best left to a jury. The Court assumed based on the briefing before it that Dr. Hamdan voluntarily resigned from Heart Partners. However, the issue was not fully developed on summary judgment, and the Court agrees with Dr. Hamdan that it did not need to be. Accordingly, Dr. Hamdan may, if he believes the evidence warrants it, assert at trial that he was constructively discharged from Heart Partners and therefore he is entitled to recover the expenses associated with his relocation to Florida. It will then be up to the jury to determine what the circumstances of his relocation were and whether the requirements of constructive discharge are satisfied. *See, e.g.*, *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) (setting out methods of proving constructive discharge).[3] Accordingly, Dr. Stauffer's expert opinion that Dr. Hamdan's maximum earning ability in Tampa, Florida is $600,000 will not be excluded.

---

[3] The Court understands that Dr. Hamdan has not filed suit against Heart Partners, his employer, for constructive discharge. Indeed, Dr. Hamdan notes that his "complaint against *the Hospital* is precisely that it violated his civil rights, allowed a hostile-with-respect-to-ethnicity-workplace to fester without amelioration, and thus interfered with his enjoyment of the (non-employment) contractual relationship, resulting in constructive termination of *that* contractual relationship, further resulting in career-long damage to his professional standing and his earning capacity because of the black mark permanently affixed to his name." Dkt. No. 146 at 5. However, in order to determine the proper offset amount to his potential damages, it does matter whether Dr. Hamdan can link the Hospital's actions—as noted in his complaint—to being "effectively forced out" of Heart Partners, resulting in his move to Florida.

### B. Drs. Walker and Weinstock

The Hospital also objects to the opinions of Drs. Walker and Weinstock. Dr. Walker opined as follows:

> Interventional cardiologists who are qualified to lecture, speak, teach []and serve as an FDA investigator and who are committed to supporting these services earn between $250,000.00 and $1,000,000.00 from performing these services.
>
> . . .
>
> It is my opinion, based upon my vast experience as an interventional cardiologist, speaker, lecturer, consultant and FDA investigator, [that] Dr. Hamdan permanently lost his financial opportunities, as described above, once the first adverse action was issued.

Dkt. No. 142-4 ¶¶ 12, 20. Dr. Launey used these figures to calculate Dr. Hamdan's future economic loss in "non-patient care services." Dr. Weinstock opined as follows:

> It is my opinion, based upon my education, training and experience, the reasonable value of compensation for Dr. Hamdan's services, as an interventional cardiologist beginning January 1, 2012 and thereafter is One Million Dollars ($1,000,000.00) to in excess of Two Million Dollars ($2,000,000.00).
>
> . . .
>
> The April 14, 2011 Adverse Action also severely limited Dr. Hamdan's ability to obtain employment by a group or Hospital and obtain privileges at a Hospital in an environment that would allow him to earn One Million to Two Million Dollars ($1,000,000.00 - $2,000,000.00) as an interventional cardiologist. I have served on credentials committees and have knowledge about the sensitivity credentials committees have toward physicians such as Dr. Hamdan who have been subjected to an adverse action. The adverse action Dr. Hamdan experienced will require disclosure each time he applies for Hospital privileges and will permanently serve as a limitation on his ability to obtain privileges in settings conductive to making $1,000,000.00 to $2,000,000.00 annually.

Dkt. No. 142-5 ¶¶ 17, 19. Dr. Launey used these figures to calculate Dr. Hamdan's future economic loss in patient care.

To begin, the Court notes that the Hospital, incorrectly, argues that "[t]he Court's Order [on summary judgment] regarding Hamdan's external defamation claim demonstrates that Dr.

Walker's and Dr. Weinstock's projections of 'lifelong diminution of [Hamdan's] professional standing and thus his earning capacity' would not assist a trier of fact and should be excluded as well." Dkt. No. 152 at 7. The Hospital is referring to the Court granting its motion for summary judgment with regard to Dr. Hamdan's defamation claim premised on the republication to Dr. Kovacs, the Chairman of the Institutional Review Board at Indiana University. In its Entry, the Court noted that the Hospital could not be held liable for defamation for this claim because it informed Dr. Kovacs, truthfully, that Dr. Hamdan was undergoing peer-review; it noted that Dr. Kovacs was not "informed of the particular allegedly-defamatory statements contained in the Cath Lab employees' complaints." Dkt. No. 147 at 27. To assert, however, that this precludes Dr. Hamdan from asserting that he will experience lifelong reputational damages as a result of being wrongly subjected to peer review is incorrect. Dr. Hamdan is free to assert at trial that he has incurred career-long reputational damages due to the "black mark" left by the choice of the Hospital to submit him to peer review and issue two adverse actions against him. *See* Dkt. No. 146 at 10 ("As the Hospital well knows, physicians are always asked whether they have previously been the subject of an adverse action or peer review proceeding in these situations. In addition, the Hospital knows that it is required to answer similar questions about physicians who have made application elsewhere."). The Court's Entry on summary judgment does not preclude these damages.[4]

Turning now to the Hospital's arguments, essentially the Hospital argues that Drs. Walker and Weinstock's opinions are speculative and the monetary figures they offer are groundless, "bottom-line" figures, "plucked out of thin air." The Hospital takes issue with the fact that neither referenced Dr. Hamdan's past income—which was much lower than that which

---

[4] The Hospital ignores Dr. Hamdan's § 1981 claim in arguing as such.

either affiant proposed—in opining on what his future economic loss might be, nor do either base their opinions on established compensation data from a reputable source, such as the Medical Group Management Association ("MGMA"). Moreover, the Hospital disagrees that Dr. Hamdan, prior to being subjected to peer review, was at a "breakout" point in his career, or in a super-elite category of interventional cardiologists who are able to make millions of dollars in patient care and non-patient services.

To begin, the Court disagrees with the Hospital that the figures contained in both affidavits have no bases. Both Drs. Walker and Weinstock base their opinions on their own earnings and that of their colleagues, their familiarity with Dr. Hamdan—including his skill level and talent—and their years of experience in the medical field, including providing patient care and non-patient services. In this regard, their figures certainly are not, as the Hospital argues, plucked out of thin air. *See, e.g.*, Dkt. No. 145 at 15 ("By contrast, Dr. Walker and Dr. Weinstock relied on their own experiences in their professional work—participating, both nationally and internationally, in precisely the activities for which they were making income projections."); *id*. at 21 ("And this is not based on speculation; it is based on their knowledge of his [Dr. Hamdan's] training and the actual results of his work, combined with their professional judgment about how he stood in his field.").

This is not to say, however, that the figures contained in Drs. Walker and Weinstock's opinions necessarily are an accurate prediction of Dr. Hamdan's future income; that will ultimately be a question for a jury to decide. As one district court has noted, "[t]here is a fine line between a court finding that proffered expert testimony is 'unpersuasive' (and capable of being submitted to a jury) and when a court concludes that evidence is wholly 'unreliable' (and properly excludable under *Daubert* )." *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d

870, 887 (E.D. Wis. 2010); *see also* Dkt. No. 146 at 22 (Dr. Hamdan noting that "impossibility in the testimony can be explored through cross-examination"). While the Hospital is free to disagree with the figures contained in both opinions, disagreement does not preclude their introduction to the jury. The issues the Hospital has with Drs. Walker and Weinstock's opinions can be addressed during a rigorous cross-examination, but the Court does not find the opinions to be so unreliable that they should not be submitted to the jury.

### C. Dr. Launey

Finally, the Hospital objects to Dr. Launey's report. Dr. Launey calculated the loss to Dr. Hamdan's past and future earning capacity in two categories of medical services:

(1) non patient care services including but not limited to teaching, lecturing, speaking, consulting, and serving as a FDA investigator [and]

(2) clinical patient care as a cardiologist and interventional cardiologist.

Dkt. No. 142-6 at 3. He used the figures provided by Drs. Stauffer, Walker, and Weinstock—those for the residual earnings offset, non-patient care services, and patient care—to compute Dr. Hamdan's future economic loss. Dr. Launey "estimated three totals: the maximum estimate, the minimum estimate and the range midpoint estimate." *Id*. He computed the loss amount "to age 67 (the earliest age to receive full Social Security benefits) and age 70 years (the average age of retirement for cardiologists)," and came up with a range of "future loss," from a low of $10.2 million to a high of $56.6 million. *Id*. at 3-4.

While the Hospital advances some specific, technical arguments that can be addressed on cross-examination, the thrust of the Hospital's motion to exclude Dr. Launey's opinions is that they are based on speculative, inaccurate data—the three interventional cardiologists' opinions. As noted above, however, the Hospital can address its disagreements with those opinions on cross-examination; they are not so unreliable as to preclude the jury from hearing them. The

10

same rings true with Dr. Launey's report; the Hospital is free to challenge his assumptions, his sole reliance on the opinions expressed by the interventional cardiologists, and his lack of using any other data source on cross-examination. The Court does not find his opinions to be so unreliable, however, as to preclude the jury from hearing them.

The Hospital's Motion to Exclude and Objection to Plaintiff's Proffered Experts (Dkt. No. 142) is **DENIED**.

## II. Plaintiff's Motion to Exclude the Opinions and Testimony of Defendants' Proffered Expert, Gary Skoog, PhD

Dr. Hamdan moves to exclude the expert opinions of the Hospital's expert, Dr. Gary Skoog. Dr. Skoog offered a rebuttal report to Dr. Launey's report regarding Dr. Hamdan's alleged loss of earning capacity; he opined that Dr. Hamdan did not suffer any loss of earning capacity due to the facts underlying this lawsuit. Dr. Hamdan argues that Dr. Skoog's opinions are unreliable for a variety of reasons.

First, Dr. Hamdan objects to the following part of Dr. Skoog's report:

> Indeed, regarding losses alleged to have begun in 2013 and to be continuing, I note that the plaintiff moved to Florida as a matter of personal preference. He prevailed in his final hearing, and had no lost contract income as of the day in October, 2012 (per his boss, Dr. Harlamert . . . ) that he left. He was on track to make his production. He was told that he would have been a part of the new contract and team with Heart Partners, and he would have enjoyed the same terms as others pegged at the 90th%-ile in that group . . . Persons change employers and geographical locations all of the time for personal reasons. The lack of a state income tax and Florida's weather certainly come to mind as amenities associated with such a change.
>
> In the many years that I have done loss of earning capacity cases, this is the weakest and most speculative claim I have ever seen. . . . The actions of the plaintiff in this matter are voluntary.

Dkt. No. 141-2 at 18. Dr. Hamdan notes that this issue is "hotly contested" by the parties and that if "Dr. Skoog was purporting to decide for himself . . . that Dr. Hamdan had left

11

'voluntarily,' that would be a serious usurpation of the jury's function, and completely inappropriate for an expert witness." Dkt. No. 141 at 6. As noted above, the Court agrees that whether Dr. Hamdan voluntarily resigned from Heart Partners and voluntarily moved to Florida is an issue for the jury to decide. **Therefore, Dr. Skoog's opinion that Dr. Hamdan's actions in this case were voluntary and made as a matter of personal preference is EXCLUDED.**

Next, Dr. Hamdan objects to Dr. Skoog's use of—and reliance on—an affidavit from Dr. Spencer B. King III. Dr. King disagreed with the figures and opinions set forth by Dr. Hamdan's experts, opining, in relevant part, the following:

> To say that a new physician has permanently lost any ability to gain the necessary experience and recognition because of an unpublished letter is a gross exaggeration.
>
> Further, the contention that Dr. Hamdan, as a relatively new physician entering the interventional cardiology field, has supplemental earning capacity (unrelated to clinical productivity) in excess of $1,000,000 annually and permanently lost the opportunity to earn millions of dollars is not based upon accurate or even remotely likely earnings for even the most experienced, sought after interventional cardiologist.
>
> . . .
>
> Dr. Weinberg's contention, contained in his Affidavit, that the reasonable value of compensation for Dr. Hamdan's services as an interventional cardiologist for his clinical practice alone beginning January 1, 2012 is $1,000,000 to in excess of $2,000,000 annually is grossly exaggerated and inflated based upon Dr. Hamdan's previous earnings and amounts actually earned by interventional cardiologists in clinical practice.

Dkt. No. 141-2 at 133, ¶¶ 11, 12, 17.

First, Dr. Hamdan argues that Dr. King is "an expert in the wrong field[.]" Dkt. No. 141 at 3. Dr. King is an interventional cardiologist; Dr. Hamdan is "an interventional cardiologist sub-specializing in peripheral vascular procedures." Dkt. No. 141 at 6. While the Court recognizes the difference between the types of procedures an interventional cardiologist performs and those that an interventional cardiologist sub-specializing in peripheral vascular

12

procedures performs,[5] the fact is that Dr. Hamdan is an interventional cardiologist. As the Hospital notes, "cardiology is a specialty and interventional cardiology is a subspecialty" which "includes peripheral vascular procedures like the ones Hamdan performs." Dkt. No. 145 at 9, 5. The Hospital also correctly explains that "Dr. King's testimony was not considered by Dr. Skoog to show what procedures Hamdan could perform or Hamdan's success rate in performing peripheral vascular procedures—his Affidavit was used by Dr. Skoog as a source of information regarding the compensation paid to interventional cardiologists who perform peripheral vascular procedures." *Id*. at 8. Dr. Hamdan's argument that Dr. Skoog's opinion is unreliable due to his reliance on Dr. King's affidavit is without merit.

The same rings true with Dr. Hamdan's argument regarding Dr. Skoog's use of data from the MGMA. Dr. Hamdan explains that data from the MGMA is "generally sound and is often used by personnel offices to set compensation levels[.]" Dkt. No. 141 at 7. The Hospital describes it as "the 'go-to' source for information on physician compensation[.]" Dkt. No. 145 at 9. However, Dr. Hamdan objects to the MGMA data because it does not contain specific information on the compensation of interventional cardiologists specifically performing peripheral vascular procedures; he thus argues that Dr. Skoog's reliance on this data renders his opinions unreliable. The Court disagrees and finds Dr. Skoog's reliance on a compensation model for interventional cardiologists is wholly appropriate given that Dr. Hamdan *is an interventional cardiologist*. If Dr. Hamdan wishes to press this issue further—as well as the lack

---

[5] As Dr. Hamdan explains, "[a]n interventional cardiologist is trained to perform catheter-based treatment of structural heart diseases [by] insert[ing] sheaths or other devices into blood vessels in order to either reach the heart or to treat problems in the veins or arteries directly." Dkt. No. 141 at 3, n. 1. An interventional cardiologist "uses catheter-based procedures to treat peripheral artery disease from the upper legs to the toes . . . to improve blood flow in the legs to avoid amputation." *Id*. at 3, n. 2.

of "differentiation between skill and reputation levels of individual physicians" in the MGMA data—he is free to do so on cross-examination. Dkt. No. 141 at 3.

Finally, Dr. Hamdan objects to Dr. Skoog's use of his prior earnings data. Essentially, Dr. Hamdan argues that he was on the verge of a "breakout" in his career, and that his past earnings are a poor benchmark for what he was going to earn in the coming years. Again, Dr. Hamdan is free to challenge Dr. Skoog's failure to consider his forthcoming "breakout"—or the possibility that he was underpaid—on cross-examination. The Court agrees with the Hospital, however, that "Dr. Skoog's use of prior earnings history in this case is a trustworthy and reliable methodology[.]" Dkt. No. 145 at 11.

Thus, Dr. Hamdan's Motion to Exclude the Opinions and Testimony of Defendants' Proffered Expert, Gary Skoog, PhD (Dkt. No. 140) is **GRANTED IN PART. Dr. Skoog's opinion that Dr. Hamdan's actions in this case were voluntary and made as a matter of personal preference is EXCLUDED.**

### III. Defendants' Motion for Clarification[6]

The Hospital filed a Motion for Clarification of the Court's Entry on summary judgment (Dkt. No. 154). The motion seeks clarification of the following: 1) which allegedly-defamatory statements the Court found for which the Hospital can be held liable; and 2) whether the Court imputed the Cath Lab employees' bad-faith motivation to the Hospital. The Court will address each issue, in turn, below.

---

[6] Dr. Hamdan filed a motion for leave to file a surreply to the Hospital's motion for clarification (Dkt. No. 167). This motion is **GRANTED. The Clerk is directed to docket Dr. Hamdan's surreply found at Dkt. No. 167-1.**

## A. The Defamatory Statements

The Hospital seeks clarification as to the specific statements "the Court is entertaining as a basis for Plaintiff's defamation claim in order that it might elicit and/or present evidence in defense of those specific communications." Dkt. No. 154 at 3. It argues that the Court's Entry on summary judgment "is silent with respect to which of the statements emanating from the Cath Lab employees can serve as the foundation for a finding of *respondeat superior* liability for them." *Id*. at 1.

Tracking Dr. Hamdan's allegations, the Court noted in its Entry on summary judgment that "Dr. Hamdan has alleged that he was defamed by the Cath Lab employees' false complaints[.]" Dkt. No. 147 at 25. For clarification sake, at this point, the only allegedly-defamatory statement that is no longer actionable is Dr. Hamdan's defamation claim premised on the Hospital's republication to Dr. Kovas. *See id*. at 27. That is to say, all of the complaints made by the Cath Lab employees—noted in the Court' Entry on summary judgment—that Dr. Hamdan alleges were false and/or misleading remain actionable.

The Hospital seeks clarification on this issue, as noted above, so it can prepare for the upcoming trial in this cause; however, it also seeks clarification because it believes that some of the still-actionable defamatory statements are time-barred[7] and argues as such in its supporting briefs. Dr. Hamdan disagrees with the Hospital that any claims are time barred, but also disagrees with the means the Hospital chose to assert these arguments. *See* Dkt. No. 165 at 1 ("Dr. Hamdan does not agree with the reasons that the Hospital has advanced in seeking clarification, nor with the consequences that the Hospital appears to assume will follow if the

---

[7] In its Answer to Dr. Hamdan's Amended Complaint, the Hospital pled this as an affirmative defense. *See* Dkt. No. 53 at 8 ("The applicable statutes or other periods of limitations may bar some or all of Plaintiff's claims.").

15

clarifications it seeks are made (such as that certain of Hamdan's claims would be time-barred)."). Indeed, the Court agrees with Dr. Hamdan that a "motion for clarification" is the improper vehicle to make such a dispositive argument; this statute of limitations argument could have been raised on summary judgment.

That said, whether or not certain allegedly-defamatory statements are time-barred is an issue of law that should be decided prior to the trial in this cause. Pursuant to Federal Rule of Civil Procedure 56(f), therefore, the Court hereby gives notice to Dr. Hamdan that it will consider summary judgment on this issue. *See* Fed. R. Civ. P. 56(f)(3) ("After giving notice and a reasonable time to respond, the court may . . . consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."). The Court believes that the Hospital has clearly articulated its position in its briefs. **Thus, by Monday, April 20, 2015, Dr. Hamdan shall file a Response to the Hospital's statute of limitations argument. In his response, he shall list each allegedly-defamatory statement he desires to submit to the jury and the date the statement was made. He should then explain why each statement is not barred by the applicable two-year statute of limitations for defamation claims brought pursuant to Indiana law. No reply brief shall be filed unless invited by the Court.**

### B. Immunity

The next point of clarification the Hospital seeks is "whether the Court imputed the Cath Lab employees' *motivation* behind their complaints (good faith vs. bad faith) to IUHN under the doctrine of *respondeat superior* when considering immunity for both the defamation and IIED claims." Dkt. No. 154 at 4. In its Entry on summary judgment, the Court declined to find that the

Hospital was immune under federal and Indiana law, finding that issues of fact remain as to whether or not the Hospital's actions were taken in good faith.

In its motion for summary judgment, the Hospital argued that it was entitled to immunity under 42 U.S.C. § 11112:

> For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken—
>
> > (1) in the reasonable belief that the action was in the furtherance of quality health care,
> > (2) after a reasonable effort to obtain the facts of the matter,
> > (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
> > (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
>
> A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.

In his response, Dr. Hamdan argued that "the Hospital is liable for the defamatory statements of its employees under the doctrine of *respondent superior*, which provides that vicarious liability may be imposed upon an employer for the wrongful or tortuous acts of an employee while acting within the scope of his or her employment." Dkt. No. 113 at 26. He then noted that "[c]onspicuously absent from the Hospital's argument is the pertinent language of 42 U.S.C. § 11111(a)(2), which provides immunity for those providing information to a professional review body, '*unless* such information is false and the person providing it knew such information was false' (emphasis supplied)." *Id.* at 26. In response to this argument, the Hospital argued that Dr. Hamdan failed to show that the Cath Lab employees' complaints were "false and made without belief or grounds for belief in their truth." Dkt. No. 118 at 14. The Court disagreed with the Hospital, noting that there was sufficient evidence that the Cath Lab employees had knowingly

17

submitted false information via their complaints and that the Hospital itself questioned the veracity of these complaints.

Now, in its motion for clarification, the Hospital argues that the bad faith of the Cath Lab employees cannot be imputed to the Hospital under *respondeat superior*. Moreover, it argues that "Indiana law presumes good faith" on the part of the Hospital. Dkt. No. 166 at 9. It notes that it

> cannot control what motivates the complainer. If the complainer's bad faith is imputed to the hospital, then the hospital is deprived of protection regardless of what it does with the complainer's information. Conceivably, even if the hospital did everything right in its review of complaints, it would still be deprived immunity if the complainer was motivated by ill will. This outcome does not fulfill the mission of the statute.

Dkt. No. 154 at 5-6. The Court recognizes this; however, it has been less than clear from the parties' briefs how the immunity statute interplays with the doctrine of *respondeat superior*. Therefore, the Court would like additional briefing on this issue so it can properly rule on whether or not the Hospital is immune from Dr. Hamdan's defamation claim even under a *respondeat superior* theory. Accordingly**, the Hospital shall file a brief, discussing the interplay between 42 U.S.C. § 11111, 42 U.S.C. § 11112, and *respondeat superior* liability on or before Monday, April 20, 2015. Dr. Hamdan shall respond on or before Monday, April 27, 2015**. **No reply brief shall be filed unless invited by the Court.**

## IV. Conclusion

For clarity's sake, the Court has resolved the pending motions as follows:

- The Plaintiff's Motion to Exclude the Opinions and Testimony of Defendants' Proffered Expert, Gary Skoog, PhD (Dkt. No. 140) is **GRANTED IN PART. Dr. Skoog's opinion that Dr. Hamdan's actions in this case were voluntary and made as a matter of personal preference is EXCLUDED.**

- The Hospital's Motion to Exclude and Objection to Plaintiff's Proffered Experts (Dkt. No. 142) is **DENIED.**

18

- The Plaintiff's Motion for Leave to File a Surreply (Dkt. No. 167) is **GRANTED. The Clerk is directed to docket Dr. Hamdan's surreply found at Dkt. No. 167-1.**

- The Defendants' Motion for Clarification (Dkt. No. 154) is **GRANTED** to the extent noted above.

    o **By Monday, April 20, 2015, Dr. Hamdan shall file a Response to the Hospital's statute of limitations argument.**

    o **The Hospital shall file a brief, explaining the interplay between 42 U.S.C. § 11111, 42 U.S.C. § 11112, and *respondeat superior* liability on or before Monday, April 20, 2015. Dr. Hamdan shall respond on or before Monday, April 27, 2015**.

In light of the additional briefing that is needed in this case, the Court, on its own motion, **VACATES the May 1, 2015, final pretrial conference and June 1, 2015, trial dates. The final pretrial conference is hereby rescheduled for Friday, June 5, 2015, at 12:00 p.m., and the trial is rescheduled for Tuesday, July 7, 2015, at 9:00 a.m.** Both will be held in Room 202 of the Birch Bayh Federal Building and United States Courthouse located at 46 East Ohio Street, Indianapolis, Indiana. The parties are reminded of their pre-trial preparation deadlines contained in Dkt. No. 32.

**The May 1, 2015, at 1:00 p.m., date shall proceed as a status conference. Counsel are required to attend, out-of-state counsel may appear telephonically, and clients may appear if they so choose. The settlement conference with Magistrate Judge Dinsmore remains set for May 4, 2015, at 9:00 a.m.**

SO ORDERED: 4/7/15

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification